

| ARAPAHOE DISTRICT COURT,<br>Court Address: 7325 S. Potomac St. #100<br>Centennial, CO 80112 | Filed<br>MAY 29 2019<br>CLERK OF THE COMBINED COURT<br>ARAPAHOE COUNTY, COLORADO |
|---|---|
| **Plaintiff: MARY CHARNEY**<br>v.<br>**Defendant: UNITED AIRLINES, INC** | COURT USE ONLY |
| *PRO SE Plaintiff*<br>Mary T. Charney<br>2150 Springcrest Road<br>Colorado Springs, CO 80920<br>(719)217-9338<br>marytcc@msn.com | Case Number:<br>**19CV-139**<br>Division: 402<br>Courtroom: 402 |
| **COMPLAINT AND JURY DEMAND** ||

COMES NOW Plaintiff Mary Charney, to hereby bring this Complaint and Jury Demand against Defendant United Airlines, Inc. and as grounds thereof, states and alleges as follows:

1. Defendant United Airlines, Inc. is a corporation incorporated in Delaware.

2. The Defendant is headquartered at 233 S. Wacker Drive, Chicago, Illinois 60606.

3. The Court has personal jurisdiction over United Airlines, Inc., Defendant, through its registered agent residing in Arapahoe County, with a post office address of 7700 E. Arapahoe Road Ste 200, Centennial, Colorado 80112.

4. Defendant availed itself of an employer/employee relationship with Plaintiff in the state of Colorado, making subject matter jurisdiction proper for the claims sought.

5. The amount claimed herein does not exceed the jurisdiction of the court.

OR

6. The amount sought from United Airlines, Inc., Defendant, is to be decided by trial but Plaintiff seeks a monetary judgement in excess of $100,000.00 dollars and 00.00 cents ($100,000.00), together with proper interest, costs and any other items allocable by statute or specific agreement, for lost wages and backpay, based on her

1

wage at the time of termination, back pay, her promotional wage, emotional pain and suffering, punitive damages, and/or attorney's fees.

## FACTUAL BACKGROUND

7. Such claim arises from the following event(s) or transaction(s):

8. Ms. Charney began employment with United Airlines on November 2nd, 2015 earning $9.42 per hour. For safety precautions employees were prohibited from carrying or using cell phones while working. Ms. Charney did not wear a watch during her shifts, and relied upon a wall clock for accounting for time.

9. For the length of her employment, Ms. Charney performed her duties competently. She did not receive any reprimands, either orally or in writing. Ms. Charney received a pay increase at least once during her employment. Her performance was such that in or around April 2017, United appointed Ms. Charney as the Team Lead for Security in the Line Operations Safety Audit program. Ms. Charney's duties in this role included performing daily safety audits and distributing and monitoring sharps, United's nomenclature for knives, in United's Denver based catering facility.

10. On or about May 13, 2017, Ms. Charney interviewed for and was offered the position of Safety Coordinator in United's Catering Operations Building. The interview was conducted by the Supervisor of Safety for Catering Operations at United Airlines in Denver. This position would have come with a substantial increase in pay. Unfortunately, the finalized paperwork was continuously held off for months at a time, until Ms. Charney was unlawfully terminated.

11. On August 7, 2017, between 11:00 a.m. and 12:00 p.m., Ms. Charney presented the Safety Management System C.O.R.A. (Catering Operations Roll Out program) in the cafeteria with Kevin, another Safety Coordinator. The content of said presentation, ironically, was that employees should feel safe reporting unsafe and unsecure situations without fear of retaliation from United.

12. At 12:00 p.m., Ms. Charney clocked out per her manager's instruction. At 1:00 p.m., Ms. Charney clocked back in to work overtime, this being her sixth consecutive work day. Sometime between 12:30 p.m. and 3:00 p.m., Ms. Charney broke her left middle finger when she dropped a Safety Reward card (aka Gotcha Card) that she had awarded to an employee into the metal deposit box located outside of the Safety Office. It should be noted that no clock exists in the vicinity of the Safety Office, making exact time accounting difficult.

13. The box was secured to a wall outside the office and was about six feet off the ground. Attempting to use the box in a normal manner, her finger got stuck between a metal wedge or lip that was perpendicular to the portal slot where cards were dropped, however due to defection in the box, she immediately felt pain in her finger when she removed her hand from the defective deposit box. Shortly after her injury, Ms. Charney went to speak with Ashlee, a United employee who was covering the Equipment Cage. Ms. Charney asked Ashlee whether she thought it was a bad bruise or if Ms. Charney needed medical attention.

14. Sometime before 3:00 p.m. on August 7, 2017, Ms. Charney told her manager, Brad Hock, about her injury. Mr. Hock took notes of their conversation. Ms. Charney proceeded to tell Mr. Hock exactly what happened and how she had reached into the

3

Exhibit A

metal box outside the Safety Office to insert a "gotcha card" and had gotten her finger stuck. Ms. Charney added that she thought she had simply bruised her finger but knew it was her responsibility to report any workplace injury. Mr. Hock concluded the discussion by telling Ms. Charney that he wasn't sure what he was supposed to do but would go to the Safety Office to find out. Ms. Charney, for her part, was instructed to return to the dock to continue work. Within thirty minutes, Mr. Hock returned to the dock and instructed Ms. Charney to report to the Safety Office and speak with Ken, another Safety Coordinator. Ms. Charney went to Safety Office and, when she arrived, showed Ken her finger and how she injured it. Ken handed Ms. Charney an incident report form and told her that she needed to document what happened and make three copies. Ms. Charney returned to Mr. Hock's office to inform him what Ken had told her. Over the course of these conversations, Ms. Charney was never informed or advised to seek medical attention, simply to complete the forms and ensure they were submitted by the end of her shift.

15. During the course of the afternoon of August 7, Ms. Charney showed her finger to several United colleagues, including Mr. Hock and the Maintenance Manager, Randy, and explained how she had injured her finger. At this time, Ms. Charney's finger was badly swollen and bruising. Ms. Charney worked the remainder of the work day and clocked out at 8:30 p.m. After her shift, she saw Paul Andrew, another Safety Coordinator who was covering the night shift. Mr. Andrew took pictures of Ms. Charney's injured finger and at this time strongly advised that Ms. Charney seek

4

medical attention. He even offered to take her to the emergency room. Ms. Charney declined and told Paul that she wanted to go home but would seek medical attention following day.

16. On August 7, 2017 at around 8:30 p.m., Ms. Charney filled out an Employee Statement Form, which states in full: I went to drop a Gotcha Card into the Gotcha Card Drop box outside of the Safety office when I accidently got my finger stuck when I pulled my hand away from the slot & the top of the box. Today, I kept ice on my finger. Tonight before leaving work my finger has gotten considerably more swollen and black & blue. I spoke w/Paul Andrew and he recommended that I get Paperwork from a manager tonight just in case I need to see a Dr. tomorrow."

17. After speaking with Mr. Andrew, Ms. Charney spoke to a Varkay Pagnelli, Manager of Transportation and Thomas Ready to receive an On the Job Injury report (OJI) paperwork, which Mr. Ready completed for Ms. Charney. Ms. Charney told Mr. Andrew and Thomas Ready, Transportation Supervision, that she was unsure of the time of her injury due to the secure nature of the facility and lack of clocks within the vicinity of the injury. Thomas Ready told Ms. Charney to put a time down, with Mr. Ready telling Ms. Charney, "Just guess." Ms. Charney wrote, "August 7, 2017" for the date of her injury and wrote, "1320" for the time of her injury.

18. The following morning, August 8, 2017, Ms. Charney went to the Concentra, the workers compensation provider for United Airlines, for examination. During her appointment Ms. Charney's left hand was examined and X-rayed. The treating physician concluded that Ms. Charney's left middle finger was broken and put her finger in a splint. The physician did not list any restrictions since Ms. Charney's job

5

Exhibit A

did not have any duties that required heavy lifting, and Ms. Charney thought she could work at without restrictions while protecting her finger.

19. On August 10, 2017, Ms. Charney treated a second time with Concentra. The treating physician continued to provide care for Ms. Charney "nondisplaced fracture at the base of the distal phalanx without visualized dislocation or osseous lesion."

20. On August 19, 2017, four days prior to meeting with Mr. Eget, Ms. Eckmen and Mr. Hock Ms. Charney witnessed a safety violation involving a Catering truck vehicle. Per the United Airlines Food Services **Working Together Guidelines** the Safety Policy states to report any conditions either verbally or in a written report. Ms. Charney provided a written report to the Transportation Department along with her Manager, Brad Hock in Security regarding the tortious conduct of a Catering truck in the Food Services outbound docks.

21. On August 20, 2017 Ms. Charney was called into the Transportation Department where the Supervisor on duty reprimanded her for stating names on the Incident Report submitted on August 19th involving a Catering Services truck and United employees. She was instructed to remove the names of the participants and encouraged to reword the event specific to the near miss she had submitted in writing. Ms. Charney stated she would not remove names.

22. On August 23, 2017, Mr. Hock approached Ms. Charney telling her that he needed to talk with her about her injury. Mr. Hock led Ms. Charney to a conference room where Susan Eckman, Safety Supervisor, and Ed Eget, Senior Manager of Human Resources were already seated. Mr. Eget told Ms. Charney that he needed to follow up regarding Ms. Charney's August 7, 2017 injury. Mr. Eget began by noting that

Ms. Charney clocked in at 11:00 a.m. on August 7, 2017. Ms. Charney acknowledged that she did because she came in to help with the C.O.R.A. (Cafeteria Operating Reporting Application) presentation in the cafeteria. She added that Mr. Hock had instructed her to clock out after the presentation but to clock back in at 1:00 p.m. as she was working overtime that day. Ms. Charney next explained how she had injured her left middle finger. Mr. Eget responded that he had reviewed the security footage and that the footage does not "show you anywhere near the Safety Box at 1:20 p.m. that afternoon. "How are we to believe that you came to work that day already injured?" Mr. Eget was telling Ms. Charney in no uncertain terms that he felt she was lying. Yet at 11:00 AM when Ms. Charney clocked in she was at the time clock with Mr. Hock and video surveillance above would reveal Ms. Charney had no injury to her hand when arriving to work.

23. Ms. Charney told Mr. Eget that she had no reason to fake an injury and had no reason to misrepresent that her injury had occurred at work. Ms. Charney emphasized that she did not know the exact time of her injury but that it could have occurred within an hour or hour and a half of the time she wrote down on the Employee Statement Form. Messrs. Eget and Hock and Ms. Eckman told Ms. Charney that they were going to go back and review the footage and speak with Ms. Charney after they did so, which was puzzling considering no camera exists in the direct area where the injury occurred.

24. About 30 minutes later, Mr. Hock brought Ms. Charney into his office and showed her about two minutes of security footage beginning at about 2:44 p.m. on August 7. That footage showed Ms. Charney not wearing a glove on her left hand. From the

7

footage, Ms. Charney determined that she had injured her left middle finger before that time because she could not wear a glove with her finger bruised and swollen. However, the footage itself was inconclusive as to whether Ms. Charney had injured her left middle finger since there was no closeup of her left hand. Mr. Eget commented that from the footage "it doesn't look like you injured your left hand but that you injured your right hand because you were not wearing gloves and are biting your right hand." Ms. Charney repeated that she had injured her left middle finger in the manner she had previously described, but that she simply did not know the exact time she got hurt. Ms. Charney emphasized that she reported her injury to her manager, Mr. Hock, filled out an incident report describing what had happened, and treated with Concentra after her injury. She had no reason to falsify how her injury occurred.

25. At the conclusion of the second discussion, Mr. Hock told Ms. Charney that he, Mr. Eget, and Ms. Eckman needed to continue the investigation, and that Ms. Charney would be placed on paid administrative leave until the investigation was completed. Ms. Charney repeated that her finger is broken, that she broke her finger at work, and that not coincidently United moved the metal safety box and taped the inside of the safety box within a day after she reported her injury. Ms. Charney also told Mr. Hock the cafeteria security footage would show that she didn't have any injuries to her left hand between 11:00 a.m. and 12:00 p.m.

26. On the morning of September 5th, 2017 Ms. Charney received a phone call from Paula Reppas informing her that she needed to come in to "discuss her employment at United."

27. On September 5, 2017, Ms. Reppas and Ms. Eckman met with Ms. Charney. Ms. Eckman began reading a letter stating that Ms. Charney was being terminated for "Falsifying an injury and not being truthful in an investigation."

28. As a result of this investigation, which included a review of the video footage and Ms. Charney's written and verbal statements, United determined that Ms. Charney's injury did not happen like she said it happened, and that video footage revealed that she never placed a card in the box at the time she said the injury occurred.

29. The letter further stated that an ""Thorough" investigation was done"." Inquiry into what efforts had been made in the investigation was met with a vague answer.

30. While the first few sentences were being read off Ms. Reppas asked Ms. Charney if she was recording the meeting. Upon learning that indeed she was recording the meeting Ms. Reppas informed Ms. Charney that it was illegal to record the meeting and that if Ms. Charney would need to turn off the phone recording device or that the meeting was over. The meeting concluded at this time.

## FIRST CLAIM FOR RELIEF

31. Plaintiff realleges and incorporates by reference paragraphs 1 through 30 as though fully set forth herein.

32. Plaintiff's discharge contravenes a well-defined and clear mandate of public policy as set forth in the Colorado Constitution, Colorado statues, regulatory provisions, and/or the common law in that public policy encourages employees to report workplace injuries and avail themselves of the right and protections afforded by the

Workers Compensation Act of Colorado, C.R.S. 8-40-101 to 8-47-209. *See also Lathrop v Entenmann's Inc.*, 770 P2.d 1367. 1372 (Colo. App.1989).

33. United Airlines discharge of Plaintiff for filing a worker's compensation claim is contrary to public policy and harms the general public. Colorado public policy, and specifically the Workers Compensation Act of Colorado, encourages employees to seek treatment for their work-related injuries by filing workers' compensation claims. By terminating Plaintiff's employment while still under medical care and in retaliation for filing a worker's compensation claim, Defendant violated a well-established Colorado public policy.

34. United Airlines fired Plaintiff while still under medical care.

35. United Airlines termination of Plaintiff was motivated by bad faith, malice and/or retaliation against Plaintiff for exercising a statutory right, performing an act that public policy encourages and/or for failing to perform an act that public policy condemns.

36. As a direct and proximate result of United Airlines above described conduct, Plaintiff has suffered economic and non-economic damages, entitling her to an award of actual, compensatory, and consequential damages, including damages for emotional distress and mental anguish, in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1. Judgement in Plaintiff's favor and against Defendant;

2. Economic damages for lost past and future income, lost benefits of employment, reimbursement of expenses, and other damages sufficient to make Plaintiff whole from Defendant's conduct;

3. Compensatory damages for emotional distress and mental anguish;

4. Pre-and post judgement interest at the maximum rates allowed by law;

5. Reasonable legal fees and costs;

6. A letter of apology;

7. A letter reversing "termination" as cause for losing employment at a company she expected to work at until retirement;

8. All other legal or equitable relief to which Plaintiff is entitled.

The Defendant is not in the military service of the United States. The Defendant is a private corporation.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

**WARNING: ALL FEES ARE NON-REFUNDABLE. IN SOME CASES, A REQUEST FOR A JURY TRIAL MAY BE DENIED PURSUANT TO LAW EVEN THOUGH A JURY FEE HAS BEEN PAID.**

SPACE LEFT INTENTIONALLY BLANK

11

Exhibit A

Note: All Plaintiffs filing this complaint must sign unless the complaint is signed by an attorney.

*Mary T Charney*
Signature of Plaintiff

_____
Signature of Attorney for Plaintiff (if applicable)

2150 Springcrest Rd   COS, CO 80920
Address(es) of Plaintiff(s)

719-217-9338
Telephone Number of Plaintiff

## VERIFICATION

STATE OF COLORADO      }
                       } SS.
COUNTY OF El Paso      }

I, Mary T. Charney, hereby certify that the contents of the foregoing are true and correct to the best of my knowledge and belief.

*Mary T Charney*
Mary T. Charney

The foregoing was acknowledged before me this 28th day of May 2019.

Witness my hand and official seal.

My commission expires: 04/18/2020

*C. Christen Hollinger*
Notary Public

Charlotte Christen Hollinger
Notary Public
State of Colorado
Notary ID 20164014689
My Commission Expires April 18, 2020

12

Exhibit A